## North Braddock Borough's Boundary Case.

Argued October 1, 1936.

Before KELLER, P. J., CUNNINGHAM, BALD-
RIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*Joseph F. Mayhugh,* with him *James A. Nugent,* for appellant.

*Oliver K. Eaton,* with him *M. E. Evashwick* and *Charles L. McCormick,* for appellee.

OPINION BY STADTFELD, J., February 26, 1937:

The issue in this case is correctly set forth in the first opinion of the lower court in this case by MARSHALL (ELDER W.), J., as follows: "Pursuant to the provisions of the Act of June 24, 1931, P. L. 1206, Article III, Sect. 302, the Township of North Versailles petitioned this court to ascertain and determine a disputed boundary line between the township and the Borough of North Braddock. The line in controversy extends from the westerly boundary line of East Pittsburgh Borough in a westerly, then southerly, direction to the Monongahela River, at the mouth of Turtle Creek. Commissioners were appointed to inquire into the matter, and to their report and findings the Borough and the School District of the Borough have filed 35 exceptions.

"The northern and western boundaries of North Versailles Township have always been a stream known as Turtle Creek. On the opposite side of that creek now lie the adjacent boroughs of East Pittsburgh and North Braddock. There would be no uncertainty as to the location of the boundary line between North Braddock Borough and North Versailles Township were it not for the fact that about 1892 or 1893 the Carnegie Steel Company, in order to extend and enlarge its Edgar Thompson Works which lay immediately west of Turtle Creek, diverted the course of that stream into an artificial channel which it had constructed a considerable

distance east of the original, natural channel. In course of time the old channel was filled with slag and a part of the steel works constructed over it, so that every trace of the original location has long been obliterated. All parties concede that the boundary line now in dispute is the center line of the old creek channel; the only problem before the commissioners was to determine, as accurately as possible from all available data, the precise location of such old channel."

Article III, Sect. 302 of said Act of Assembly provides as follows: "Petition to Alter or Ascertain Township Lines and Boundaries. The courts of quarter sessions may, upon the presentation of a petition, (a) alter the lines of two or more adjoining townships so as to suit the convenience of the inhabitants thereof; (b) cause the lines or boundaries of townships to be ascertained and established; and (c) ascertain and establish disputed lines and boundaries between two or more townships or between townships and cities or boroughs."

Pursuant to the provisions of this Act, the court appointed a commission to inquire into the prayer of the petition.

At the first Court of Quarter Sessions in 1788, Allegheny County was divided into seven townships, including, inter alia, Versailles Township.

At No. 25 March Sessions, 1869, Versailles Township was divided into two divisions, one part being called "South Versailles Township" and the other part "North Versailles."

In 1895, East Pittsburgh Borough was incorporated at No. 10 December Sessions, 1894, Charter Book Vol. 22, page 38.

In 1896, the Borough of North Braddock was chartered at No. 10 December Sessions, 1896, Charter Book Vol. 24, page 38.

In the meantime the Carnegie Steel Company had

acquired the entire holdings of the McKinneys and the Millers aggregating in the neighborhood of 200 acres of ground, running from Thirteenth Street, Braddock on the west, to and beyond the old channel of Turtle Creek, and to and beyond the present channel of Turtle Creek, as now located. This plant had developed rapidly, and its extension had arrived at a point in the vicinity of the old channel of Turtle Creek. As located at that time, this Creek was an obstruction to the further development of the plant, and, as it was located entirely upon the property of the company, it was decided to change the course of this Creek through said property by shifting it eastwardly a distance of 700 feet, more or, less, to the bottom of the bluffs above Port Perry, to a new channel to be excavated. This work was begun in 1892 or 1893 and without any objection on the part of any person or municipality, a new channel was dug and the Creek turned into it. The old channel was filled. That filling was begun just above the Hamburg Bridge. The superstructure of this bridge was moved to its new and present location over Turtle Creek, as relocated. The old channel was filled in, and the land lying between the new channel and the old was likewise filled with blast furnace slag and other material. This work was completed prior to the incorporation of the Borough of North Braddock about the year 1895 or 1896. Since that time extensions to the steel plant have been constructed up to and beyond the old channel of Turtle Creek, Commission Plan, and thus into the Township of North Versailles. The question of whether or not this occurred, and if so, to what extent, precipitated the problem in this case. That problem is the determination of the boundary line by the location of the center line of the old channel of Turtle Creek. This has been rendered most difficult by reason of the fact that since

1894 that channel has been obliterated by fills and construction.

After hearing, the Commission on October 2, 1933 filed its report. To this report, exceptions were filed on October 31, 1933. On May 17, 1934, after discovered evidence of importance having developed, upon petition presented, the court on May 17, 1934 referred the case back to the Commission. After having taken said testimony, the Commission on August 20, 1934, filed what it called its second and final report. To this report exceptions were filed on September 14, 1934. Thereafter, upon argument, the court on April 5, 1935, filed an opinion, dismissing certain of appellant's exceptions and sustaining others, and again referred the case back to the commissioners for a further report in accordance with instructions contained in said order. These instructions strongly indicated to the Commissioners that the testimony of A. B. Little, a civil engineer, who surveyed a part of the boundary line herein involved, should be accepted as accurate in the determination of the "beginning point" at the junction of the lines of the Borough of North Braddock, East Pittsburgh and North Versailles Township "at or near the center line of Turtle Creek." On April 30, 1935, the Commission having reconsidered its second and final report and the testimony bearing thereon, filed its final report. Exceptions were filed to this report by the Borough of North Braddock on May 28, 1935. After argument, these exceptions were overruled on May 28, 1935 and these and certain of the first exceptions, also overruled, now become the basis of this appeal. These exceptions were argued before ELDER W. MARSHALL, J., who wrote the opinion, and Judges KENT and SWOYER, specially presiding sitting, in banc.

The Commissioners had before them a large number of ancient documents, (plans, maps, surveys, atlases, deeds, etc.) which indicated the general course of Turtle

Creek as it formerly had flowed from the East Pittsburgh Line to the Matlack Corner. Of the many plans, conveyances and other documents which refer to Turtle Creek as a boundary or describe various of its courses, and which were submitted to the Commissioners, the more important were: (1) Charter of North Braddock Borough, in 1896; (2) W. L. Miller Plan of Lots, laid out in 1852; (3) Deed from George L. Miller et al. to William W. Martin et al., dated 1872; (4) Partition deeds between John and Robert McKinney in 1862; (5) Deed from Robert McKinney to Carnegie, McCandless & Company, dated 1873. The Miller plan (2) and the Miller-Martin deed (3) comprise property lying east of the original location of Turtle Creek, while the McKinney deeds (4 and 5) describe property immediately west thereof.

It is uncontroverted the boundary between borough and township begins at a point in the old creek channel at a corner common to East Pittsburgh Borough, North Braddock Borough and North Versailles Township, and continues by the center of such channel, westwardly and then southwardly, to the mouth of the creek at the Monongahela River. The description of the incorporated area contained in the charter of North Braddock Borough calls for the common corner before mentioned, and thence proceeds "along the township line of North Versailles" by stated courses and distances (not, however, specifically designated as the center of the old channel) to a point "on township line in mouth of Turtle Creek at low water line in Monongahela River."

In view of the scope of our functions to determine whether or not the report of the Commissioners as finally confirmed by the lower court is supported by legally competent testimony, and the complicated character of the inquiry, and not to make confusion worse confounded, we shall quote largely from the opinions

of the lower court, in order to understand what testimony was relied upon, and what was rejected in ascertaining and fixing the disputed boundary line.

The Charter line in the incorporation of North Braddock Borough is referred to in the first opinion of the court as follows: "Such charter line is referred to in the testimony as the Middlemist line, and had it been obtained by actual survey on the ground, would perhaps be determinative of the controversy. Unfortunately the testimony indicates such line was prepared merely from data taken from deeds of property in the vicinity; when run on the ground, it missed the mouth of Turtle Creek by more than 100 feet. Accordingly, it was quite inaccurate and the Commissioners properly refused to adopt it."

Quoting further from the same opinion; "For reasons equally sufficient, the Commissioners refused to be governed by data contained on the W. L. Miller Plan of Lots. The original of this plan was not produced, and the fact that the plan book in which it was recorded has been twice recopied in the past 82 years indicates the possibility of serious error in the courses and distances now shown on the present book. But in any event, the plan itself does not pretend to extend to the center of Turtle Creek as it existed in 1852; the creek is delineated as wholly outside of and beyond the surveyed area. It is true the western boundary of lots 3 and 4 appears to be the east bank of the creek, but along the north boundary of lots 2 and 3, which exceptants contend must also be the shore line of the creek, the distances are omitted, so that the plan itself is incomplete. Moreover its worth as a reliable piece of engineering was destroyed by an accurate survey of part of the Miller farm made by Edeburn-Cooper & Company in 1892. The latter survey locates the west line of the Miller property (i. e., the center of Turtle Creek) as much as 150 feet west of the westerly line

of lots 3 and 4, now claimed by exceptants as the shore line of the creek. Since all testimony on the subject indicates the stream was but 100 feet wide, and hence the distance from shore line to center line approximately 50 feet, it follows either that the Miller plan did not extend to shore line, or that it was surveyed so crudely and inaccurately that no dependence can be placed upon it. Neither party produced any deed which called for the center line of the creek and also for the Miller plan or for any lot therein. Manifestly the plan was of little value either in fixing the center of the creek or in corroborating the accuracy of the Miller-Martin deed.

"The deeds between John and Robert McKinney, partitioning a tract of land lying west of, but bordering on, Turtle Creek were rejected by the commissioners because the descriptions therein will neither close nor plot. Exceptants do not pretend they will close; indeed, in their brief they assert 'The McKinney partition survey does not sustain the findings of the commissioners and consequently must be rejected.' Notwithstanding these descriptions have been checked by engineers and found to be inaccurate, exceptants seek to draw some benefit from the fact, as they assert, that one of the lines 'substantially reaches the Martin (deed) line'. But the many deficiencies in the partition survey which exceptants themselves point out are sufficient vindication of the action of the commissioners in declining to rely upon the fidelity of such survey. As a matter of fact, exceptants nowhere make claim that any part of the line contained in the partition deed should be adopted as the true location of the old creek channel."

As to the method of procedure by the Commissioners, the lower court said: "The Commissioners found there had been two physical 'monuments' along the course of Turtle Creek:—(a) the mouth of the creek itself

and (b) a structure known as the Hamburg Bridge, which formerly spanned the creek a short distance east of the East Pittsburgh-North Braddock-North Versailles corner. The Commissioners proceeded to fix the precise location of the creek mouth, which the evidence showed had not shifted for more than a century; next they endeavored to ascertain the precise location of the Hamburg bridge; and then they determined, from available data, the meanderings of the stream between those points."

The correctness of locating the mouth of Turtle Creek is conceded. Likewise no fault is found with the first eight courses measured from the creek mouth, as fixed by the Commissioners extending up to the Matlack corner.

Quoting further from the first opinion of the lower court: "There was produced before the commissioners a plan of a survey of the properties of John and Robert McKinney which engineers of Carnegie-McCandless & Company had made in 1873. The deeds which John McKinney and his brother made to that Company in the same year unquestionably were prepared from this survey, for they follow it in every detail. On this plan, the center line of Turtle Creek is delineated, by exact courses and distances, as the eastern boundary of the Robert McKinney tract, which in fact it was. Engineering calculations, which the commissioners made, demonstrate that the descriptions in the McKinney deeds close and are mathematically correct. These descriptions call for and rest upon certain fixed monuments and landmarks, such as 13th Street in Braddock, the Pennsylvania Railroad, the Pittsburgh and Connellsville Railroad (now the B. & O. Railroad), and the Monongahela River. By a survey which the commissioners made, the descriptions of 1873 were found to check with such monuments and landmarks and thus the precision and fidelity of the survey of 1873 were

verified. No one who reads the testimony and studies the exhibits in this case can fail to conclude that the center line of Turtle Creek was accurately located on the Robert McKinney deed and the Carnegie-McCandless survey, and that they are the most truthworthy evidence presented to the commissioners."

The only objection which has been urged as to the Robert McKinney deed is that the lines extending down the center of the creek fail by 173.39 feet to reach the line of the Monongahela River and do not cross the center of the old Pittsburgh & Connellsville Railroad bridge over the creek channel. However, the last line leading toward the river calls for the river as a terminus, in which event the river as a monument or boundary must control over the distance given for the line: *Cox v. Couch,* 8 Pa. 147; *Chisholm v. Thompson,* 233 Pa. 181, 193, 82 A. 67.

Additional corroboration of the accuracy of the McKinney line is found in the old map of the Edgar Thompson Works of the Carnegie Steel Co., whereon are shown in detail the right of way of the railroad, the center of the old creek channel, a locomotive shed still standing on its original location and other data. Using the shed as a base, the map indicates the intersection of the center lines of creek and railroad right of way as being not more than 5 or 6 feet from the McKinney line.

The deed from Miller to Martin is dated October 12, 1872, approximately two months earlier than the Robert McKinney deed, but, unlike the McKinney deed, it calls for no monuments which are now visible on the ground, for the railroad bridge has been covered with a fill of more than 10 feet and the Hamburg bridge was removed to another location many years ago.

Regarding the Miller-Martin description, the lower court calls attention to the fact that it will not close by more than 33 feet. As stated in the first opinion: "Because of its inaccuracies, the Miller-Martin descrip-

tion cannot prevail as against the McKinney survey and description, which accurately close, rest with exactitude upon fixed objects and are reasonably corroborated by the plans of railroad and steel companies, and by the description in deed from Matlack to Carnegie Steel Co., in 1892.

"The McKinney deed line followed the center of the old channel of Turtle Creek not only from the mouth of the creek to the Pittsburgh and Connellsville Railroad, but also for two additional courses and distances, until it turned away from the creek and proceeded northwardly along the Matlack line. For convenience we now designate such point of departure as the Matlack corner. Our considered judgment is that between the Monongahela River and the Matlack corner, the commissioners properly and correctly located the disputed boundary line as coinciding with the McKinney deed line, and that no sufficient reason has been advanced for disturbing their action with respect to such portion of line."

It is important here to call attention to the testimony given by one A. B. Little, a civil engineer. The comments of the lower court therein are most illuminating: "Mr. Little, now an aged man, appeared as a witness before the commissioners, and testified explicitly and without contradiction that he incorporated in the charter plan and description of boundary lines, the courses and distances shown on the Improvement Company's plan of lots, without actually surveying the same; but that the charter line, 'thence by the same course (South 22° 1' West) 390.15 feet to a point at or near the center line of the old channel of Turtle Creek' was surveyed and carefully measured by him from the southerly side of Cliff Street to the middle of the old creek channel. He also produced his original field notes, which corroborated the fact that he had begun measurement of the latter line from the southerly

side of said street. His testimony and field notes further showed he had then run two additional courses eastwardly along the center of the old creek channel, thereby arriving at and locating the center of the Hamburg bridge ......If any one fact in this whole proceeding seems clear, it is that Little's survey is trustworthy. He not only testified in detail to the method whereby, from a fixed point, he found and located the center of the old bed of Turtle Creek, which method is fully authenticated by his original notes of survey but the accuracy of his work is attested by the fact that even at this day his courses and distances from the monument on the southside of Cliff Street (a street in East Pittsburgh Improvement Company Plan) to the monument at Braddock and Electric Avenues, totalling about 1½ miles, have been resurveyed and found to check upon both monuments, just as his field notes indicate they did when the survey was made. Undoubtedly, he located the center of Turtle Creek as it existed in 1895. His proof is explicit, and undenied that it was found to be South 22° 1' West 390.15 feet from the southerly side of Cliff Street. This point, then, is the corner common to the two boroughs and the township, and is the true location of the eastern terminus of the boundary now in dispute."

Upon the filing of the first report of the Commissioners, the same was after argument, referred back to them for the purpose of taking the depositions of the said A. B. Little, hereinbefore referred to, relative to the location of the Hamburg bridge. Excavations which had been made and stones uncovered which at first were thought to be the abutments of the bridge, by subsequent examination showed that they were merely stones of a culvert and not a part of the bridge. After taking of the same, a second report was filed by the Commissioners wherein they reported that the disputed boundary line in the vicinity of the Hamburg bridge

were as fixed in the original plot or draft filed with the first report.

Upon the argument of exceptions to the second report, the court recommitted the same for the correction of certain errors in accordance with the opinion filed after disposition of exceptions filed to both the first and the second reports. Thereupon a final report was filed by the Commissioners on April 30, 1935, wherein they reported that the proper boundary between the Township of North Versailles and the Borough of North Braddock, from the point of beginning or the point common to the Township of North Versailles, the borough of North Braddock and the Borough of East Pittsburgh and the point known as the Matlack corner as designated in the opinion of the court, filed April 5, 1935, is the center line of Turtle Creek as it existed at the time of the creation of Pitt Township and Versailles Township. The Commissioners further affirmed the point known as the Matlack Corner, as set forth in their plot or draft theretofore filed.

Quoting from the final report of the Commissioners filed April 30, 1935: "To arrive at the line between these two points or the center line of Turtle Creek at the time above set forth, your Commissioners have carefully considered the fact that the bearings called for in the Robert McKinney deed to Carnegie-McCandless Co., the Mary J. Matlack deed to Carnegie Steel Company, and the William W. Martin deed to Carnegie Brothers and Company clearly seem to be on one 'base,' in that they accurately agree with each other, and have the same bearing calls on each common line. (This indicates to your Commissioners that any error in the Martin deed did not occur in the first two bearing calls.)"

The Commissioners further reported "That the center line of Turtle Creek, or the disputed boundary line between the Township of North Versailles and the

Borough of North Braddock, from the point of beginning or the point common to the Borough of East Pittsburgh, the Borough of North Braddock and the Township of North Versailles, and the United States Harbor Line, is fixed by the following courses and distances: Beginning at a point on the dividing line between the Borough of North Braddock and the Borough of East Pittsburgh, said point being located South 23 degrees 16 minutes West, 390.15 feet, measured on the dividing line between said Boroughs from the South side of Cliff Street; thence continuing North 80 degrees 2 minutes and 20 seconds West, 975.91 feet, North 78 degrees 47 minutes 20 seconds West, 454 feet, South 74 degrees 4 minutes West, 185.10 feet, South 40 degrees 29 minutes West, 264.00 feet, South 16 degrees 34 minutes West, 261.00 feet, South 37 degrees 39 minutes East, 143 feet, South 74 degrees 39 minutes East, 317 feet, South 15 degrees 39 minutes, 127 feet, South 18 degrees 36 minutes West, 165 feet, South 6 degrees 31 minutes West, 432.04 feet, South 16 degrees 7 minutes West, 110 feet to end of Carnegie-McCandless & Co. deed; thence continuing South 16 degrees 7 minutes West, 36.63 feet to a point; thence South 44 degrees 36 minutes 30 seconds West, 137.70 feet to United States Harbor Line at the Monongahela River. As more fully appears in the plot or draft of said boundary, prepared by Kerr & Martin, Registered Engineers, signed by your Commissioners and filed herewith as a part of this record."

Appellant's assignments of error relate to the findings of the Commissioners based on the testimony hereinbefore referred to, and to the rejection by them of certain data presented on behalf of appellants for the reasons also hereinbefore set forth. These assignments, while not separately disposed of, have been considered and answered in our general treatment of the proposition as a whole.

Appellant contends in its twelfth assignment of error that the Commissioners erred in fixing the center line of the old channel of Turtle Creek in such a position as the said center line crosses the southwestern portion of the Germania Savings Bank Plan of Lots, thereby fixing the Northern line of said Plan in such a position that it intersects Lots Nos. 2, 3, 4, 5, 6, and 7 in the said Germania Savings Bank Plan.

The answer to this contention is found in the opinion of the lower court from which we quote: "The answer to this contention is that the various documents and records which are in evidence are not consonant each with the others, so far as the former location of Turtle Creek is concerned, and that if the commissioners had adopted the location shown on the Germania Bank plan, such location would have been in conflict with almost every other document and record in the case. Manifestly, any location which may be adopted will run counter to some bit of documentary evidence in the case. The commissioners wisely and properly adopted as the true location the lines which are sanctioned and verified by the great majority of the maps and plans bearing on the matter. ......Moreover it is by no means clear beyond peradventure that Turtle Creek, flowing on the line established by the commissioners, would pass over any part of the Germania Bank Lots. The plan, laid out in 1884, is shown as abutting on a thirty-three-foot public road, whereas the present highway is a borough street of much greater width. That the southerly sideline of the old roadway coincides with the southerly sideline of the present street is more or less conjectural; while there are some circumstances from which a deduction to that effect is sought to be drawn, no direct proof has been presented. Furthermore, exceptants' engineer, in plotting the Bank plan on the commissioners' plan, has not superimposed the street line of the plan precisely on the present side-

line of Braddock Avenue. If there should be an exact superimposition, it would be found that the suggested location of the center of the creek channel does not touch upon any lot in the bank's plan."

There is also corroboration in the testimony of Mr. Blum in reference to this plan, wherein he states: "It shows Turtle Creek south of the lots. It shows a definite space in between the rear line of the lots and the shore line of Turtle Creek."

Appellants further contend that the Commissioners erred in making or having made a survey locating the starting point of the Martin survey (the Hamburg Bridge) by a survey by Kerr & Martin used as a basis for its conclusion. The duties of the commission are very clearly stated in Section 303 of the Act of June 24, 1931, P. L. 1206 as follows: "and they, or any two of them shall prepare a report, together with their opinion of the same, and accompany it with a plot or draft of the boundaries proposed to be altered or ascertained and established if the same cannot be fully designated by natural lines or boundaries."

A complete answer is found in the opinion of the lower court from which we quote: "In this connection we may state that the action of the commissioners in causing an independent survey to be made was wholly within their powers. In making such survey, only the data already in evidence was used, and since the commissioners were unable to accept as the true boundary line either the Middlemist line claimed by the petitioners, or any of the lines advocated by the Borough and School District, they were obliged, of necessity, to survey and plot the lines called for by the various plans and conveyances which were in evidence, in order to determine the true location of the disputed line and to accompany their report with a plot thereof, as the statute requires. Without the right to survey as they

did, the commissioners would have been powerless to comply with the terms of their appointment."

Commenting on the final report of the Commissioners, the lower court, in its opinion filed October 8, 1935, says: "It is apparent that the recommended lines, so far as direction and length are concerned, are almost identical with those appearing on many of the ancient documents in the case. Since they serve to connect the Matlack corner with the corner common to the three municipalities mentioned, and correspond so closely with the lines shown on or called for by numerous plans and deeds, we believe they represent the old course of Turtle Creek between the points mentioned, as accurately as engineering skill, applied to all of the documents in the case, can accomplish after such great lapse of time and with the former creek channel now wholly obliterated."

After a careful consideration of the entire testimony we are of the opinion that there is legally sufficient testimony and evidence upon which the findings of the Commission are based; old surveys, plans, maps, pictures, descriptive historical records, deeds and private records concerning the location of the various public properties, together with the testimony of old residents of the locality and of expert civil engineers, all of which tend to and do present full and sufficient data and grounds to sustain the ascertainment, establishment and fixing of the true line in the channel of old Turtle Creek as the boundary between the Borough of North Braddock and the Township of North Versailles. We feel that the Commission have impartially tried to reconcile all the conflicting evidence in this case, and have as nearly as is humanly possible established a line which rests upon substantial evidence and one which correctly establishes the true boundary between the parties.

Quoting from the opinion by Judge KELLER (now

President Judge) in the case of *Yeiser v. Hornberger et ux.*, 99 Pa. Superior Ct. 453, on p. 457: "There are, it is true, some inconsistencies in the testimony. The court below was not bound to adopt the theory of either the plaintiff's surveyor or defendant's surveyor. Had we been the triers of fact, we might not have made precisely the same findings, but that is not important. There was evidence to support the court's findings and in consequence we may not disturb them. They have the force and effect of the verdict of a jury. They establish what was the boundary between the properties."

The reports of the Commissioners show most exhaustive research and the able opinions of the lower court most careful consideration. It is only proper to state that it is evident that counsel on both sides endeavored to give all assistance possible, both to the Commissioners and to the court in the attempt to solve a most difficult problem.

The assignments of error are overruled and the order of the lower court is affirmed at appellant's cost.